IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| F. CHRISTOPHER O'LEATH, | ) |
| Plaintiff, | ) Civil Action No. 11-598 |
| v. | ) Judge Cathy Bissoon |
| KENNETH BACHA, *et al.*, | ) |
| Defendants. | ) |

# MEMORANDUM ORDER

## I. MEMORANDUM

Plaintiff Christopher O'Leath ("Plaintiff") brings this instant cause of action against Defendants Kenneth Bacha, Paul Cycak, and Westmoreland County (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983. Currently pending before the Court is Defendants' Motion for Summary Judgment (Doc. 39), which, for the reasons stated below, will be granted.

**BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff's allegations stem from his employment as a deputy coroner at the Westmoreland County Coroner's Office, where Plaintiff worked full-time from April 2002, until his termination in March 2010. (Doc. 40 at ¶ 8). Plaintiff alleges that in April 2005, Defendant Kenneth Bacha ("Bacha"), the Coroner of Westmoreland County, asked Plaintiff to illegally perform campaign work during County working hours. (Doc. 22 at ¶15). Plaintiff allegedly viewed this request as a "demand" and performed this work in fear of losing his job. Id. Shortly thereafter, Defendant Paul Cycak, ("Cycak"), the Chief Deputy Coroner of Westmoreland County, also directed Plaintiff to perform campaign work on behalf of Bacha. Id. at ¶ 16. Between 2005 and 2009, Plaintiff completed various tasks with regard to Bacha's campaign,

including helping to prepare of a golf outing brochure, putting up political signs and circulating petitions. (Doc. 40 at ¶ 63). However, in late 2008 or early 2009, Plaintiff informed Bacha, on two separate occasions, that he believed that his work on campaign activities was illegal and improper, and that he would no longer do the work. (Doc. 42, Ex. N. at 162). Plaintiff also informed Cycak of his opposition to doing campaign work in late 2008. Id. at 168.

In late 2009, Plaintiff went on medical leave. Prior to going on leave, Plaintiff placed drug evidence from a scene investigation into his desk drawer. Id. at 81. In January 2010, while Plaintiff was still on medical leave, the office adopted a new policy on how drug evidence was to be stored. (Doc. 42, Ex. F). Specifically, under the new policy, evidence was to be kept in a new evidence room. Plaintiff was informed of this new policy via email on January 11, 2010. Id.

Further, while on medical leave, Plaintiff attended an autopsy at Carlow University with a female colleague. (Doc. 42, Ex. N. at 71). Plaintiff did not inform Bacha or Cycak about his intent to attend the autopsy, nor did he seek their permission. Id. at 73. During that autopsy, Plaintiff took possession of x-rays from the Doreanna Clarke case. Id. at 64. Plaintiff retained the x-rays for four days, and then brought them to Bacha at the Coroner's Office the following Monday, at which point, Bacha, who had been looking for the x-rays for a significant period of time, became angry at Plaintiff. Id. at 77.

On February 19, 2010, right before he was set to return to work, Plaintiff had a telephone conversation with a co-worker, Josh Zappone, wherein Zappone told Plaintiff that Bacha or Cycak were upset about something Plaintiff did with the regard to the implementation of the new evidence room. (Doc. 42, Ex. N at 51). During that conversation, Plaintiff made a statement to

Zappone about being "dangerous." Id. While the exact statement is unclear from the record,[1] Plaintiff testified that he did not intend his comment to be any sort of physical threat. Id. at 53. Instead, Plaintiff meant that he possessed dangerous information about Defendants, because he could report them to law enforcement for forcing him to do campaign work during county time. Id. at 52-53.

Regardless, Zappone reported this comment to another co-worker, Gerry Fritz, who relayed them to Bacha on February 22, 2010. (Doc. 42, Ex. G). Fritz perceived the statements as a "serious potential physical threat" on Bacha and others in the office. (Id.; Doc. 42, Ex. O at 16-17). Accordingly, upon confirming these statements with Zappone, Bacha and Cycak met with others about the threat, and then shut off Plaintiff's county login and cell phone. (Doc. 42, Ex. G). When Plaintiff arrived at the office later that day, Plaintiff was immediately required to attend a meeting with Bacha and Cycak. (Doc. 42, Ex. N at 57).

During this meeting, Bacha informed Plaintiff that he was being suspended, and gave him several reasons for the suspension. First, Bacha brought up the statements that Plaintiff had made to Zappone about being dangerous. Then, Bacha referenced several disciplinary matters, including attending the autopsy at Carlow without permission, retaining the Doreanna Clarke x-rays, and failing to comply with the new evidence policy. Id. at 57-58. According to Plaintiff, there was also a "discussion" about how Plaintiff was opposed to doing campaign work. Id. at 84. Plaintiff was then escorted to his desk, where Bacha and Cycak questioned him about the drug evidence in his desk. Id. at 79, 82-83.

---

[1] During his deposition, Plaintiff first acknowledged that he said "They don't know how dangerous I can be; I can be dangerous." (Doc. 42, Ex. N at 51). Later in the deposition, Plaintiff testified that these were not his exact words, and that he believed that his statement was: "the information and the things that [Bacha and Cycak] had me do can be dangerous to them. They've had me perform illegal things." Id. at 52.

On February 26, 2010, Bacha notified Plaintiff that his suspension would continue indefinitely, without pay, as a result of the performance issues that were discussed at the meeting. (Doc. 40 at ¶ 44). Plaintiff then attended a meeting with Bacha and Cycak on March 5, 2010, where he was informed of his termination. Id. at 45.

As a result of these events, Plaintiff has brought the instant lawsuit, arguing that his suspension and ultimate termination were the result of his opposition to doing campaign work for Bacha. Defendants deny that Plaintiff ever expressed opposition to doing campaign work or that it played any role in their decision to terminate him, and assert that his termination was for legitimate, politically neutral reasons.

**ANALYSIS**

Plaintiff originally alleged a deprivation of his Constitutional rights under the First, Fifth, and Fourteenth Amendments. However, Plaintiff has agreed that Defendants are entitled to summary judgment on the Fifth and Fourteenth Amendment claims. (Doc. 46 at 30). Therefore, the only remaining constitutional violation for the Court's consideration is Plaintiff's First Amendment claim. Specifically, Plaintiff has alleged that Defendants, acting under the color of state law, have violated his right, under the First Amendment, "to engage in constitutionally protected activity and be free from retaliatory actions." (Doc. 22 at ¶¶ 52, 61). While Plaintiff's Amended Complaint does not explicitly identify the type of First Amendment he is bringing, it appears from Plaintiff's subsequent filings that he is asserting a claim for retaliation based on political affiliation.

Plaintiff brings his First Amendment claim against Defendants Bacha and Cycak individually, and Westmoreland County, based on its customs and policies, and failure to train. (Doc. 22 at ¶¶ 15, 63). Plaintiff also asserts that Defendants engaged in a conspiracy to violate

his civil rights.  Id. at ¶ 15.  Because municipalities "may not be sued under § 1983 for an injury inflicted solely by its employees or agents," the Court will first address Plaintiff's claims as they relate to Defendants Bacha and Cycak, and then will turn to the liability of Defendant Westmoreland County.  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978).  Finally, the Court will address Plaintiff's allegations of a "conspiracy" among all Defendants.

**A. Defendants Bacha and Cycak**

The Third Circuit Court of Appeals has established a three-part test for a claim of political affiliation retaliation, in violation of the First Amendment.  Under this test, in order to establish a prima facie case, Plaintiff must show: "(1) [he] was employed at a public agency in a position that does not require political affiliation, (2) [he] "was engaged in constitutionally protected conduct, and (3) this conduct was a substantial and motivating factor in the government's employment decision."  Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 271 (3d Cir. 2007).  Once a plaintiff makes the requisite showing, the defendant may "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity."  Id.

Here, Defendants do not concede the first two prongs of the test, but argue that Plaintiff cannot show that his refusal to do campaign work was a "substantial and motivating factor" in the decision to terminate him.  (Doc. 39 at ¶ 4).  The third prong of the Galli test requires Plaintiff to produce sufficient evidence to show that Defendants knew he was opposed to doing campaign work for Bacha, and fired him as a result.  See Galli, 490 F.3d at 275.  Focusing on the

issue of causation,[2] Defendants more specifically argue that Plaintiff has produced no evidence to establish that his refusal to do campaign work led to his termination.

1. **Causation**

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). "In the absence of that proof the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation." Id. (internal citations omitted).

Here, there is no temporal connection between Plaintiff's refusal to do campaign work and his suspension/termination. Plaintiff first informed Bacha and Cycak that he was opposed to doing campaign work in late 2008 or early 2009. (Doc. 42, Ex. N at 162-168). While Plaintiff voiced his opposition to Bacha twice, and Cycak once, all three occasions took place in late 2008 or early 2009. Id. It was not until one year later, on February 22, 2010, that Plaintiff was suspended and then subsequently terminated. This lack of temporal connection weighs against a finding of causation. See Revell v. City of Jersey City, 394 F. App'x 903, 907 (3d Cir. 2010) (finding that one year period between the protected activity and the retaliatory action was insufficient to satisfy "unusually suggestive temporal proximity which could prove causation"); Perna v. Twp. of Montclair, 409 F. App'x 581, 584 (3d Cir. 2011) ("[While] mere passage of time is not legally conclusive proof against retaliation . . . the passage of an extended period of

---

[2] Defendants also deny that Plaintiff ever expressed his opposition to doing campaign work; however, viewing the facts in a light most favorable to Plaintiff and drawing all reasonable inference in his favor, the Court will assume, for the purpose of the summary judgment analysis, that Defendants Bacha and Cycak knew of Plaintiff's refusal to do campaign work.

time between protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is no evidence of retaliatory animus during the intervening period.").

Turning to the record as a whole, Plaintiff first tries to show causation by vaguely alleging that he began experiencing "friction" with Cycak around the same time that he first objected to doing campaign work. (Doc. 45 at ¶ 185). However, Plaintiff has failed to elaborate on this alleged "friction" or explain how it was connected to his opposition towards campaign work, and he cannot "rest upon mere allegations, general denials or vague statements" to survive summary judgment. Vaticano v. Twp. of Edison, 514 F. App'x 218, 223 (3d Cir. 2013) (internal citations omitted).

Next, Plaintiff points to the discussions that allegedly occurred during his suspension and termination meetings, in an attempt to establish causation. While there is an obvious factual dispute over whether campaign work was discussed during these two meetings, and if so, who initiated the discussion,[3] the Court will "view the facts and all inferences to be drawn therefrom in the light most favorable" to Plaintiff, as the nonmoving party. Fagan v. City of Vineland, 22 F.3d 1283, 1287-88 (3d Cir. 1994). As such, according to Plaintiff, he "told [Bacha] during the February 22, 2010 suspension meeting that he was opposed to doing campaign work, and this

---

[3] Plaintiff himself even contradicts his own account of these events. Despite acknowledging, on multiple occasions during his deposition, that it was Plaintiff who brought up the issue of campaign work during the February meeting, Plaintiff submitted an "affidavit" after the issue was raised in the motion for summary judgment, which purports to "clarify," contrary to his deposition testimony, that it was Bacha who first brought up the subject. (Doc. 47, Ex. 1 at ¶ 4). The Court is not required to consider this "sham affidavit," since it contradicts Plaintiff's deposition testimony, and does not provide a valid explanation for such contradiction. See Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004) ("[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict."). However, even taking this affidavit into consideration, the Court finds that Plaintiff has not created a genuine issue of material fact as to whether his political affiliation was a substantial and motivating factor in the decision to terminate him.

caused an argument to occur." (Doc. 45 at ¶ 191). Likewise, Plaintiff asserts that during the March 5, 2010 termination meeting, he once again told Bacha that he was opposed to doing political work, which caused Bacha to become angry. (Doc. 46 at 21). Bacha then allegedly told Plaintiff that doing campaign work on county time was "common place" and threatened Plaintiff that if he were to report Defendants to law enforcement, he could also be in trouble for doing campaign work on county time. (Doc. 45 at ¶ 192).

Even taking these statements as true, a reasonable trier of fact simply could not infer, when viewing the record as a whole, that his refusal to do campaign work was a "substantial and motivating factor" in the decision to suspend Plaintiff's employment. See Galli at 490 F.3d at 270 ("While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.").

To the contrary, the record, as a whole, shows that Plaintiff's termination was the result of several disciplinary issues. Specifically, Defendants have asserted that "Plaintiff's termination was the culmination of several deficiencies in Plaintiff's work performance observed or investigated by Defendants Bacha and Cycak." (Doc. 47, Ex. 2 at ¶13). Defendants point to several events that took place during Plaintiff's medical leave, including: his threatening statements to Zappone; his unauthorized attendance at the autopsy with an authorized person; retention of the x-rays from the Doreanna Clarke case; and violation of the office policy regarding drug evidence. Id. Defendants also point several older disciplinary actions, such as false reporting of hours in 2009; use of an offensive business card in 2005; excessive tardiness in 2004; and incomplete and/or late autopsy reports. Id.

Additionally, even if Plaintiff is to be believed, the issue of campaign work was raised in the context of a suspension meeting, indisputably called by Bacha to discuss Plaintiff's various wrongdoings. This demonstrates that even prior to any alleged discussion with Plaintiff, Bacha envisioned serious discipline for Plaintiff's various transgressions. Moreover, Plaintiff has never suggested that at any time Bacha indicated that either his suspension or his termination were based on any issue concerning campaign work. Indeed, Plaintiff indisputably was informed that he was being suspended and terminated for the wrongdoings previously outlined. "The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury could properly find a verdict for that party." Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978) (citation omitted) (quotation omitted). Importantly, Defendant does not deny that these events took place, but attempts to defeat summary judgment by discrediting each of the reasons given by Defendants to show pretext.

### 2. Pretext

"[A] plaintiff in an employment retaliation case may avoid summary judgment by offering evidence that discredits the reasons articulated by the defense for the adverse employment action." Montone v. City of Jersey City, 709 F.3d 181, 191 (3d Cir. 2013) (finding in a political affiliation case, that Plaintiffs could avoid summary judgment by showing pretext); see also Stephens v. Kerrigan, 122 F.3d 171, 181 (3d Cir. 1997) (same). However, "to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." Fuentes v. Perskie, 32 F.3d 759, 764-65 (3d Cir. 1994). It is not enough to show that the employer's decision was "wrong or mistaken, since the factual dispute at

issue is whether the discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Id. at 765.

Here, Plaintiff attempts to discredit each reason given by Defendants for his termination. First, with regard to the "threatening statements," he made to Zappone just three days before his suspension, Plaintiff asserts that he was referring to the fact that he held "dangerous information", not making a physical threat. Plaintiff also argues that Defendants never asked him to clarify what he meant by the statements. (Doc. 46 at 15). Next, Plaintiff admits that he attended an autopsy, with a female EMT worker, while on medical leave and without permission, but nevertheless, argues that there was no office policy to the contrary. Id. at 8.

Similarly, Plaintiff does not deny that there was drug evidence in his desk on February 22, 2010, contrary to the new office policy, but argues that he was on medical leave during the implementation of the new evidence room policy, and previously, there was no policy against keeping drug evidence in his drawer. Id. at 11. Finally, Plaintiff argues that his retention of the Doreanna Clarke x-rays is pretext, because he only had them for four days, and was unaware anyone was looking for them. Plaintiff argues that rather than being fired for this conduct, he should have been given a "bonus or at least a pat on the back" for exercising responsibility for them, despite being on leave. (Doc. 46 at 14).

Despite Plaintiff's extensive attempts to discredit Defendants' reasons, a rational trier of fact could not infer "pretext" based on Plaintiff's arguments. First, it is irrelevant whether Plaintiff disagrees with the disciplinary consequences of his action or believes that his employer was wrong or mistaken. Time and time again, Plaintiff has attempted to argue that his supervisor's perceptions regarding his conduct or statements were misunderstood, mistaken, or not consistent with his intentions. While the Court disagrees, in many cases, that Plaintiff's

conduct or statements could be subject to multiple interpretations, even if the Court were to credit Plaintiff's protestations, the legal standard is *not* whether Defendant was "right," but whether its reasons were pretext for retaliation. See Fuentes, 32 F.3d at 765 (holding that a Plaintiff cannot show pretext by simply showing that the employer's decision was "wrong or mistaken").

Moreover, the fact that there was no particular policy against Plaintiff's exact conduct, does not automatically raise an inference of pretext. Plaintiff has not proffered any evidence, for example, that other employees, who did not object to campaign work, engaged in similar conduct without discipline. Instead, Plaintiff attempts to explain away his behavior, and argue why he should not have been disciplined for these actions. Given the extent and seriousness of Plaintiff's misconduct evidenced in the record, which included a statement that was reasonably viewed as a physical threat, a reasonable juror could not find that Plaintiff's refusal to do campaign work, last expressed nearly a year ago, was a substantial and motivating factor in the decision to terminate him. While a court must draw all reasonable and logical inferences in the nonmovant's favor, judgment for the moving party is proper when there is insufficient evidence of the nonmovant's position. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).

As to the older infractions, such as his tardiness, the business card prank, untimely reports, and his overtime claim, Plaintiff again does not deny that this misconduct occurred, but argues that these reasons are pretext because they are "ancient" disciplinary actions that were resolved long before his termination. (Doc. 46 at 4-7). However, as Defendants explained in their answer to the interrogatories, there was a "culmination of several deficiencies" that led to Plaintiff's termination. (Doc. 47, Ex. 2 at ¶13). The fact that some of these deficiencies

occurred several years ago, does not create an inference of pretext, especially when viewed in combination with the most recent disciplinary actions.

Plaintiff also attempts to establish pretext by pointing to minor inconsistencies in the record. For example, Plaintiff argues that there are some reasons listed in Defendant's interrogatory answers that are not reflected in Bacha's February 22, 2010 notes on the meeting. (Doc. 46 at 15-16). However, as Defendants have noted, the answer to the interrogatories included the qualifier that the reasons were "including, but not limited to…" (Doc. 47, Ex. 2 at ¶13). Finally, Plaintiff argues that the Defendant planned to terminate him long before many of these events occurred, and points to the fact that his successor, Timothy O'Donnell, told many 911 dispatchers, as early as November 2009, that he would be taking a full time job at the Coroner's Office in February 2010. (Doc. 46 at 4). However, Plaintiff has offered no evidence of this hearsay statement; and in fact, Mr. O'Donnell denied ever making such a statement. (Doc. 42, Ex. R. at 12).

Regardless, even if Plaintiff was able to show a prima facie case of retaliation for political affiliation, which the Court finds that he cannot, Defendants could still "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." Galli, 490 F.3d at 275. Here, given the events surrounding Plaintiff's termination, and the undisputed evidence substantiating those events, Defendants have shown, by a preponderance of the evidence, that Plaintiff would have been terminated, even in the absence of his refusal to do campaign work.

Therefore, because the Court finds, that the record, when viewed as a whole, lacks evidence to which a reasonable jury could infer that Plaintiff's failure to do campaign work for

Coroner Bacha was a substantial and motivating factor in his suspension and termination, Defendants' Motion for Summary Judgment as to Bacha and Cycak will be granted.[4]

**B. <u>Municipal Liability</u>**

Plaintiff's First Amendment claim against Defendant Westmoreland County is based on its policies and customs, as well as its failure to train or supervise Bacha and Cycak. (Doc. 22 at ¶¶ 38, 40-43). However, the allegations against the County are based on the same conduct as his claims against Defendants Bacha and Cycak, namely his suspension and termination. Therefore, since the Court has found above that Defendants Bacha and Cycak did not violate Plaintiff's First Amendment rights, Plaintiff's First Amendment claim against Westmoreland County must also fail. See <u>Williams v. Borough of W. Chester, Pa.</u>, 891 F.2d 458, 467 (3d Cir. 1989) ("A municipality may be liable under section 1983 only if it can be shown that its employees violated a plaintiff's civil rights as a result of a municipal policy or practice."); <u>Schlarp v. Dern</u>, 610 F.Supp.2d 450, 475-76 (W.D. Pa 2009) (citing <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986)).

Accordingly, Defendants' Motion for Summary Judgment as to Defendant Westmoreland County also will be granted.

**C. <u>Section 1983 Conspiracy</u>**

Finally, Plaintiff alleges that Defendants acted in a conspiracy to violate his First Amendment Rights. Because Defendants have prevailed on their motion for summary judgment as to the underlying First Amendment claim, Plaintiff's conspiracy claim must also fail. <u>Boyanowski v. Capital Area Intermediate Unit</u>, 215 F.3d 396, 405 (3d Cir. 2000) ("[C]ivil conspiracy may not exist without an underlying tort."); <u>Muhammad v. Dempsey</u>, 531 F. App'x

---

[4] Accordingly, the Court will not address Defendants' other various arguments for summary judgment as to Bacha and Cycak.

216, 219 (3d Cir. 2013) (internal citations omitted) ("A civil conspiracy claim requires a valid underlying tort claim, and § 1983 does not provide an independent cause of action.").

## II. ORDER

For the reasons stated above, Defendants' Motion for Summary Judgment (Doc. 39) is **GRANTED.**

IT IS SO ORDERED.


March 26, 2014                                     s\Cathy Bissoon
                                              Cathy Bissoon
                                              United States District Judge

cc (via ECF email notification):

All Counsel of Record